# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| BRANDON M. WINTERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | NO. 4:11-CV-49 -PPS-PRC |
| ) | |
| CITY OF WEST LAFAYETTE, ) | |
| INDIANA, *et al.* ) | |
| ) | |
| Defendants. ) | |

## AMENDED OPINION AND ORDER

West Lafayette Police Officer David Smith shot Brandon Winters in the neck while trying to arrest Winters for an attempted robbery in September 2009. Winters survived the shooting and filed this lawsuit under 42 U.S.C. § 1983 alleging Smith and the City of West Lafayette violated his constitutional rights by using excessive force during the arrest. The Defendants have moved for summary judgment [DE 100], arguing that the shooting was justified. According to the Defendants, Winters lunged at Smith, putting Smith in fear of his life. Winters disputes this. He claims he was trying to surrender and has pointed to enough evidence to suggest a reasonable factfinder could believe him. That's enough to preclude summary judgment. Therefore, for the reasons stated below, the Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

In September 2009, Brandon Winters, a 20-year-old African-American man from Chicago, spent about a week "riding around and getting drunk" with friends in

Lafayette, Indiana [DE 102-1 at 2]. If Winters had stuck to getting drunk, the worst that would have happened would probably have been a ticket for underage drinking. Instead, Winters branched out into strong-arm robbery and ended up with a gunshot wound and a jail sentence.

The robberies started in the early morning hours of September 16, 2009. Winters and two friends beat and robbed a man they encountered crossing a pedestrian bridge in Tapawingo Park in West Lafayette, Indiana [DE 102-1 at 5-6]. Later that night, the group beat and robbed two men outside a convenience store in Lafayette. *Id.* at 6-7.

The next night, Winters returned to Tapawingo Park to drink with his buddies. Tapawingo Park is a narrow, riverside park in West Lafayette. On the south end of the park, there is a pedestrian bridge that spans the Wabash River and connects to Lafayette. This is where Winters had robbed the man the night before and where he found himself at around 1:30 a.m. on the morning of September 17, 2009. He was urinating in the trees down below the pedestrian bridge, when he noticed a man walking on a trail that crosses under the bridge [DE 102-1 at 7-8]. Sensing he had another victim, Winters attempted to rob the man.

Winters jumped out of the woods with his sleeve in front of his face and demanded the man give up his things. [DE 102-1 at 8, 11]. Frightened, the victim turned and ran. *Id.* Winters didn't give chase. Instead, he yelled "you better not call the police," and then ambled back over to the north side of the park to rejoin his friends. *Id.*

Meanwhile, the victim had run away and found a safe place to call 911. He told

the operator that a "black dude tried shooting me on the trail" in Tapawingo Park [DE 104 at 0:45-0:56]. This was an exaggeration — Winters did not have a gun — but an entirely understandable one. The victim further described the assailant as a black man wearing a black shirt, jeans, and white shoes. *Id.* Almost simultaneously with the victim's call, the West Lafayette dispatcher broadcast that there had been an attempted shooting at Tapawingo Park and that the suspect was a black man wearing all black with white shoes. *Id.* at 1:17-1:24.

Two West Lafayette Police Officers, defendant David Smith and Marsha Miller, responded to the call [DE 108-5 at 9-10; DE 108-8 at 12-13]. About a minute after the call went out, Officer Smith advised dispatch that he had reached the parking lot at the north side of Tapawingo Park [DE 104 at 2:58-3:02]. Meantime, Officer Miller called in to say that she was at the pedestrian bridge on the south end of the park. *Id.*

Officer Smith got out of his car and started walking south into the park [DE 108-5 at 10]. He saw a group of black men gathered around a car in the parking lot and two other black men off by themselves on the southwest side of the parking lot. *Id.* at 10-11. One of the men off to the side matched the description given to the 911 operator — he was dressed in dark clothes and had white shoes. *Id.* at 11. Smith called for backup and began walking towards these two men [DE 104 at 3:17-3:21; DE 108-5 at 11].

The man in the dark clothes was Winters, who had just returned to the parking lot after the attempted robbery [DE 102-1 at 11]. According to Officer Smith, Winters and his friend were walking away from the parking lot southwest into the park [DE

3

108-5 at 11-12]. Smith started to follow them. *Id.* The west side of Tapawingo Park is bordered by Tapawingo Drive. And as Officer Smith began walking towards Winters, Winters saw a police car drive by on Tapawingo Drive [DE 102-1 at 11; DE 108-5 at 14]. This was Officer Miller driving north in response to Smith's call for backup [DE 108-5 at 14; DE 108-8 at 13]. Spooked by the patrol car, Winters took off running [DE 102-1 at 11].

Winters ran west, out of the park and across Tapawingo Drive [DE 102-1 at 11; DE 108-5 at 14]. Officer Smith radioed in to report that the suspect had fled towards a parking garage across Tapawingo Drive and began running after him [DE 104 at 3:52-3:55; DE 108-5 at 14]. Officer Miller pulled a u-turn and headed back south on Tapawingo to the garage [DE 108-8 at 15-16].

The parking garage across the street was attached to a large apartment complex that faced Tapawingo Park. Each ground-floor unit on the west side of the complex had a little deck or patio area, and, in front of each patio area there were large bushes—about three feet tall—planted up against the building. After reaching the building, Winters hid behind some of these bushes [DE 102-1 at 11].

Officer Smith, who had lost sight of Winters, noticed some dark clothing hanging off a patio railing [DE 108-5 at 15]. He thought it might belong to the suspect, so he ran over to investigate. Realizing the bushes were a natural hiding spot, Smith started searching the bushes up and down the side of the building. *Id.* at 16. Miller, who had just pulled up, joined him [DE 108-5 at 16; DE 108-8 at 16-17]. The two officers had their guns drawn and flashlights on, and they began searching all the bushes on the west side

4

of the apartment building [DE 108-5 at 16-18; DE 108-8 at 17-20, 22]. As they searched, Miller and Smith continually yelled "show me your hands" and "police." *Id.* And they advised the suspect that a K-9 unit was on its way [DE 108-8 at 22].

Winters could see and hear the officers, but did not respond [DE 102-1 at 12]. Then, Officer Miller saw him [DE 108-8 at 23]. She climbed through the foliage and wedged herself into the space between the wall and bush to get a clearer view. *Id*. She was about two feet away from Winters' feet and was in a protective posture with her gun and flashlight trained on Winters. *Id*. at 25, 34-35. She saw that Winters was lying face down with his arms tucked under his body, squeezed into the small space between the bushes and the apartment building. *Id.* at 23, 29-30. Once again, she yelled "show me your hands." *Id.* at 30.

Winters could tell by the tone of Miller's voice that he had been spotted, so this time he tried to comply with her command [DE 102-1 at 12]. Winters rolled onto his left shoulder to free his right arm, and put it up [DE 102-1 at 12; DE 108-8 at 32]. By this time, Officer Smith had joined Officer Miller and taken up a position perpendicular to Winters [DE 108-5 at 19; DE 108-8 at 30]. Although Officer Smith was on the far side of the bushes, he could still see Winters' hand and most of his torso and face [DE 108-5 at 19-20]. Seeing the right hand, both officers now ordered Winters to show his left hand [DE 102-1 at 12; DE 108-5 at 20; DE 108-8 at 33].

At this point the accounts of the shooting diverge. According to Winters, he raised his left hand and was immediately shot. Winters says that he couldn't put his left

5

hand up right away because he was lying on his left side and his left hand was trapped under his body [DE 102-1 at 12]. So in order to comply with the officers' orders, he briefly put his right hand down to adjust his body and free his left arm. *Id.* He put his right hand back up, and then, still lying on his side, he slowly raised his left hand. *Id.* At that point, he was shot.

Officer Smith tells a different story. He claims that Winters repeatedly refused to comply with the order to raise his left hand [DE 108-5 at 21]. Eventually, Officer Smith leaned over the bush to get a better view. *Id* at 22. At that point, Winters suddenly and aggressively raised his left hand directly towards Smith. *Id.* at 22-23. Fearing for his safety, Smith fired his gun. *Id.* at 24. The bullet entered Winters' neck on the right side of his body and exited at the left corner of his mouth [DE 108-14 at 5, 12]. Along the way it blew out his lower jaw and teeth and took off part of his tongue. *Id.* Smith and Miller dragged Winters out of the bushes, patted him down, and checked his vitals [DE 108-5 at 24-25; DE 108-8 at 37-40]. At that point, Smith radioed dispatch to report the shot fired [DE 104 at 5:23-5:24; DE 108-5 at 25]. The entire episode, from when Winters first took off running to when the Officer Smith made the "shots fired" call, took approximately one minute and thirty seconds [DE 104 at 3:54 to 5:24].

Winters was taken to a nearby hospital, but ended up being airlifted to a hospital in Indianapolis for surgery [DE 108-14; DE 108-15]. He eventually underwent jaw replacement surgery [DE 102-1 at 20; DE 108-2 at 56]. Winters pled guilty to, among other things, three counts of robbery and one count of attempted robbery for the events

leading up to the shooting and is currently incarcerated [DE 102-1 at 3]. Winters filed this § 1983 suit against David Smith and the City of West Lafayette in September 2011 alleging the Defendants violated his civil rights [DE 1]. The Defendants now seek summary judgment [DE 100].

## DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material facts exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, I must construe all facts and draw all reasonable inferences from the record in the light most favorable to the nonmoving party. *Id.* at 255. But the nonmoving party is not entitled to the benefit of "inferences that are supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (citations and quotations omitted).

First, some housekeeping. Winters has alleged a claim against the City of West Lafayette for its role in the shooting. He now indicates that he will not be pursuing that claim [DE 106]. As a result, the City of West Lafayette's motion for summary judgment will be granted and the case dismissed against it. That leaves the claim against Officer Smith. Winters alleges that Smith violated his Fourth Amendment right to be free from unreasonable seizure when Smith used deadly force against Winters.

A police officer's use of deadly force is a seizure within the meaning of the Fourth Amendment and accordingly must be reasonable. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Deadly force may be used if the officer has probable cause to believe that an armed suspect "poses a threat of serious physical harm, either to the officer or to others." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (citing *Garner*, 471 U.S. at 11-12); *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (en banc). So when a police officer "believes that a suspect's actions places him, his partner or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Sherrod*, 856 F.2d at 805.

The relevant inquiry is objective. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The officer's subjective good or bad intentions do not enter into the analysis. *Id.* This means that courts must view the matter "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. Moreover, the reasonableness calculation "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (citing *Graham*, 490 U.S. at 396-97).

Smith claims that the shooting was justified because he believed Winters was going to kill him. According to Smith, Winters refused repeated commands to surrender before lunging at Smith with his left hand. "We repeatedly gave orders to show his

8

other hand, his left hand and he did not comply" [DE 108-5 at 20]. Then, right at the moment when Smith provided Winters an opening by leaning over the bush, Winters made an"aggressive motion com[ing] directly up towards [Smith's] body. *Id.* at 27. Smith is emphatic that Winters moved "aggressively" and raised his hand "directly" upwards towards him: "I noticed the left hand of the subject come directly up to me very abruptly in a very aggressive manner." *Id.* at 22. The hand came up "in a very direct motion, directly upward, almost suddenly." *Id.* Smith didn't actually see a weapon in Winters' hand, but, given what he knew of the suspect's actions on the trail, Smith feared that he would be shot so pulled the trigger. *Id.* at 23-24.

If Smith's account is true, than this shooting was probably objectively reasonable. A sudden, aggressive move at close quarters from a suspect who is believed to be armed would lead a reasonable officer to fear for his safety. *See, e.g., Reese v. Anderson*, 926 F.2d 494 (5th Cir. 1991) (holding deadly force was justified when a robbery suspect reached down below the officer's line of sight as if for a gun). The problem is that key facts in Smith's account — including whether Winters made an aggressive move towards Smith—are disputed.

First, Winters claims that he neither resisted the officers' commands nor made an aggressive move towards Smith. As for the commands, Winters claims he obeyed the command to show his hands as soon as he could [DE 102-1 at 12-13]. When he realized he had been spotted, he raised his right hand right away. *Id.* When the officers ordered him to show his left, he needed to roll onto this stomach to free his left hand. *Id.* He

9

briefly dropped his right hand in order to free the left, put the right hand back up, and then was shot as soon as he raised his left hand. *Id.*

With respect to the aggressive move, Smith claims that he raised his left hand slowly, not aggressively or suddenly [DE 102-1 at 13]. Moreover, he claims that, given his body position, it would have been physically impossible to thrust his arm at Smith. Winters was on his left side with his upper arm pinned underneath the side of his head. *Id.* So when he went to raise his hand, all he could really do was lift was his forearm, and he could only lift that to the extent that his head would allow it. *Id.* Thus Winters' hand likely barely cleared the top of his head. Smith was standing closer to Winters' feet than his head, so, if Winters is telling the truth, it is unlikely that he could have thrust his hand directly at Smith.

What's more, this is not just a swearing contest. Winters' account is largely backed up by Officer Miller's testimony. She supports Winters' claims regarding his position and movements. She testified that Winters was jammed in as far as he could go underneath the bushes with his hands underneath his body, and that he had to roll over onto his left side in order to put his right hand up. [DE 108-8 at 29, 32]. He then tried to adjust his position after Officer Smith ordered him to show his left hand. *Id.* at 33-34.

The clincher is that Officer Miller testified that she did not see any behavior from Winters that would have caused her to discharge her weapon [DE 108-8 at 38]. She testified that she would have fired on Winters if she had seen him draw a weapon, or if she had seen Winters "actually doing something more towards Officer Smith." *Id.* at 38-

10

39. She saw neither. *Id.* So from Officer Miller's perspective—two feet away from Winters—there was no reason to use deadly force. This is devastating testimony to Officer Smith's case for summary judgment.

And yet there is more. Another witness, James Dumas, saw the scene from Tapawingo Park. Although he has given somewhat conflicting statements over the years, Dumas has provided an affidavit stating that, from what he could see, the female police officer, Officer Miller, had the situation under control [DE 108-21 at 3]. She had her gun drawn and her flashlight trained on Winters. *Id.* at 4. According to Dumas, "all [Smith] did was walk over with his flashlight to where the female officer had the person in view with her flashlight and under control and shot him while he was on the ground." *Id.* at 3.

There is evidence supporting Smith's account too, but this case turns on what exactly happened over the course of a few seconds in the middle of a sudden, intense confrontation. Not surprisingly, the accounts of those few seconds are conflicting and muddled. It is enough to say that Winters has come forward with evidence to support his story, and that is enough to preclude summary judgment. It will be for a jury to decide what happened in the row of bushes that night.

There is one final matter: Smith claims that he is entitled to qualified immunity because even if he was mistaken in using deadly force, the mistake was a reasonable one. The Supreme Court has identified two key inquiries for assertions of qualified immunity: (1) whether the facts, taken in the light most favorable to the plaintiff, show

that the defendants violated a constitutional right; and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 129 S.Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In this case, the answer to both questions is yes. Winters' version of events suggests Smith shot him after he had surrendered to the police. Shooting a nonresisting suspect violates the Fourth Amendment. *See Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) ("shooting a disarmed and passive suspect is a clear example of excessive force in violation of the fourth amendment"). This is true notwithstanding the suspect's previous behavior— including resisting arrest, threatening officer safety, or potentially carrying a weapon. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014).

And this right has been firmly established. *See Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 732 (7th Cir. 2013) ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects") (citing cases dating back to 1995); *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) (reversing grant of summary judgment to defendant officer on claim of excessive force because the officer's shooting could conceivably have occurred after "the immediate danger had passed."). If Winters is telling the truth, than Smith violated a clearly established right. So qualified immunity does not apply.

## CONCLUSION

Defendants Motion for Summary Judgment [DE 100] is **GRANTED IN PART**

12

and **DENIED IN PART**. The Motion is **GRANTED** with respect to the claim against Defendant City of West Lafayette. The Motion is **DENIED** with respect to the claim against Defendant David Smith.

**SO ORDERED.**

ENTERED: December 30, 2014

s/ Philip P. Simon  
Philip P. Simon, Chief Judge  
United States District Court